STANDARD GROCER CO. *v.* LOCAL NO. 406 OF THE
AMERICAN FEDERATION OF LABOR.

1. MASTER AND SERVANT—UNFAIR LABOR PRACTICE—COERCION OF
   EMPLOYEES BY EMPLOYER.
   Under the 1947 labor-management relations act it is an unfair
   labor practice for an employer to interfere, restrain, or co-
   erce its employees in the exercise of their right to self-
   organization, to bargain collectively through representatives
   of their own choosing and to engage in certain other con-
   certed activities and to refrain from any and all such activi-
   ties (29 USCA 1947 Supp. § 141 *et seq.*).

2. SAME—EMPLOYER'S COERCION OF EMPLOYEES—UNFAIR LABOR
   PRACTICE.
   Defendant union, in seeking to compel plaintiff employer to
   coerce its employees to join the union, by picketing plain-
   tiff's wholesale grocery warehouses, attempted to compel
   plaintiff to engage in an unfair labor practice now forbidden
   by statute (29 USCA 1947 Supp. § 141 *et seq.*).

3. SAME—UNFAIR LABOR PRACTICE—FREE SPEECH—CONSTRUCTION
   OF STATUTES.
   Provision of 1947 labor-management relations act that dis-
   semination of any views, argument or opinion shall not
   constitute an unfair labor practice, while an enactment of
   the guaranty of free speech provided for in the First Amend-
   ment to the Constitution of the United States, must be read
   in connection with other provisions of the act, and when so
   read, does not nullify provisions barring the employer from
   coercing its employees in the matter of joining or refraining
   from joining a labor organization (29 USCA 1947 Supp. § 141
   *et seq.*).

---

REFERENCES FOR POINTS IN HEADNOTES
[1-10] 31 Am. Jur., Labor, §§ 136-172.
[1-10] Labor Management Relations Act.   173 A.L.R. 1401.
[2] Conduct of employees or union as unfair labor practice with
    Labor Relations Act.   149 A.L.R. 464.
[5] Construction and application of National Labor Relations Act.
    112 A.L.R. 959; 115 A.L.R. 314; 123 A.L.R. 612.
[6-10] 31 Am. Jur., Labor, §§ 222-249.
[6, 8] Statutes restricting remedy by injunction in industrial dis-
    putes.   27 A.L.R. 411; 35 A.L.R. 460; 97 A.L.R. 1333; 106
    A.L.R. 361; 120 A.L.R. 316; 124 A.L.R. 751, 127 A.L.R. 868.

4. Statutes—Construction.

All parts of a statute must be read together and, if possible, given reasonable effect.

5. Master and Servant—Restriction of Employers—Power to Contract.

An employer, subject to the national labor relations act, may not encourage or discourage membership in any labor organization, and may contract only with the representative of the majority (29 USCA, §§ 158, 159).

6. Injunction—Peaceful Picketing for an Unlawful Purpose.

While peaceful picketing for lawful purposes is permissible, picketing for an unlawful purpose may be enjoined.

7. Constitutional Law—Peaceful Picketing—Free Speech.

Peaceful picketing by members of a labor union is within the constitutional guaranty of free speech.

8. Injunction—Peaceful Picketing—Purpose—Question of Fact.

In suit to enjoin peaceful picketing of plaintiff's place of business on the ground that the purpose or object sought to be accomplished was unlawful, the determination of the purpose or object of the picketing is one of fact.

9. Torts—Picketing for Lawful and Unlawful Purposes.

Picketing for combination of both lawful and unlawful purposes is unlawful.

10. Master and Servant—Interference with Relation by Labor Union—Picketing—Boycotting.

In suit to enjoin labor union from picketing plaintiff's wholesale grocery warehouses where plaintiff and its employees were not involved in a labor dispute, defendant is enjoined from picketing, from engaging in, or inducing other employers or their employees to engage in, or inducing concerted refusal to deliver supplies and goods to or from plaintiff and from threatening or ordering boycotts against persons supplying goods to or purchasing goods from plaintiff (29 USCA 1947 Supp. § 141 et seq.).

Appeal from Ottawa; Miles (Fred T.), J. Submitted January 7, 1948. (Docket No. 16, Calendar No. 43,652.) Decided May 18, 1948. Rehearing denied June 29, 1948.

Bill by Standard Grocer Company, a Michigan corporation, against Local No. 406 of the American Federation of Labor and others to restrain picket-

ing, boycotts, or interfering with plaintiff's suppliers and other relief. Decree for plaintiff. Defendants appeal. Modified decree entered.

*Earl Waring Dunn,* for plaintiff.

*M. Thomas Ward* (*Padway, Goldberg & Previant,* of counsel), for defendants.

*George S. Fitzgerald* (*Padway, Goldberg & Previant,* of counsel), for defendants on application for rehearing.

BUSHNELL, C. J. Plaintiff Standard Grocer Company is a wholesaler, engaged in selling its merchandise throughout western Michigan. Its principal place of business is at Holland and its branches are at Grand Rapids and Muskegon.

Defendant Local No. 406 is a part of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, affiliated with the American Federation of Labor, and is commonly known as the teamsters union. Defendant Thomas E. Burke is the representative of the Michigan State Conference of Teamsters, defendant Pat Mackey is the secretary of the union, and defendant Jack Walsh, when the bill of complaint was filed in this cause, had been directing a picket line at Standard's warehouse at Holland.

Defendants have appealed from a decree enjoining them from "picketing the plants and places of business of the plaintiff, from threatening or ordering boycotts against suppliers to the plaintiff of merchandise or services, and from instructing or directing their representatives, agents or members to refrain or from causing any person, firm or corporation to refrain from supplying or to cease to supply plaintiff with articles of merchandise for its stock in trade, or refrain from handling merchandise be-

longing to or intended for delivery to plaintiff, or to refrain from driving trucks containing any other materials or supplies necessary to the conduct of plaintiff's business, whether for making deliveries thereof or for any other proper purpose."

The appellants contend that a lawful labor dispute exists between themselves and plaintiff and between themselves and plaintiff's employees, "which would authorize picketing and boycotting of plaintiff by the teamsters union," and that the injunction issued violates their rights under the Thirteenth and Fourteenth Amendments to the Constitution of the United States.

Appellee contends that the action of the union is unlawful in that its picketing and boycotting is to compel Standard to become an organizing agent of the union, although their employees are opposed to becoming members. Plaintiff also maintains that such unlawful action by the union in this instance was to compel plaintiff to enter into a closed-shop agreement without information as to the terms and conditions of such agreement.

Appellee directs attention to the fact that the decree of the trial court, entered May 8, 1946, cannot become a final decree, because of defendants' appeal, until final decision here; that subsequent to the entry of the decree below the labor management relations act of 1947 (Taft-Hartley law) became effective August 22, 1947, and that decision here is controlled by this Federal act.

The rather unusual features of this case and the important constitutional questions involved require a complete understanding of the factual situation and a full explanation thereof.

At its Holland warehouse plaintiff employs 13 men, and at its Grand Rapids and Muskegon branches it employs 4, and 2, warehousemen, respectively. It receives the merchandise which it sells and

distributes by both rail and common-carrier truck service from points within and outside the State of Michigan. In the territory in which Standard operates it competes with wholesalers in Muskegon, Grand Rapids and Kalamazoo. It also acts as a servicing agent in procuring merchandise for the Independent Grocers' Alliance, a chain of grocery stores operating in this same area. The latter service constitutes a large portion of plaintiff's business. Probably the majority of the companies with whom the plaintiff competes have contracts with the defendant union. Plaintiff also competes with common carriers operating in its area, making deliveries from their warehouse to retail customers and picking up merchandise for delivery to its warehouse. The employees of the common carriers, with whom the plaintiff thus competes in this respect, are generally members of the defendant union.

Standard has no written collective bargaining agreement with its employees covering wages, hours or working conditions, nor does it have any written agreement with any collective bargaining agency, such as the defendant union, nor has defendant "labor organization" been "certified as the representative" of plaintiff's employees under the provisions of section 9 of the Taft-Hartley act.[*] It must be conceded that many of the benefits provided by the union's contract with the Standard's competitors are not enjoyed by the plaintiff's employees, and that some of the benefits which Standard's employees do enjoy, such as a bonus, are not guaranteed to them, but rather depend solely upon the discretion of the plaintiff company.

Defendant union had, from time to time, over a period of six years, made unsuccessful efforts to induce Standard's employees to join the union, and to

---

[*] 61 Stat. at L. 143 (29 USCA 1947 Supp. § 159).—REPORTER.

induce plaintiff company to sign a written collective bargaining agreement.

In April of 1945, defendant Burke approached some officials of plaintiff company with respect to the advisability of the company attempting to induce their employees to join the union. These officials indicated that they had no desire to influence their employees' decision in this respect.

Defendant Mackey testified that, because of the adverse effect upon other union members of the failure of the plaintiff company to become organized, it was decided that it would be necessary to picket Standard, and that in October of 1945 a picket line was set up at the Grand Rapids branch. It is conceded that this picketing incident, and all subsequent picketing, was both peaceful and orderly, unaccompanied by any violence.

At the instance of the conciliation division of the United States department of labor and the Michigan mediation board, this Grand Rapids incident was settled and picketing ceased when it was agreed that Standard would advise its employees of a meeting at which the union would explain the advantages of organization. Prior to this agreed-upon meeting, officials of the company "had a discussion" with its employees, during which they stated that Standard was not going to force its employees either to join or refuse to join the union. They stated in this discussion:

"It is our desire that our family relationship should be continued as it is. It is your privilege to do as you desire to do. If you vote so that the majority of you want to join the union, we shall have to recognize it and we shall recognize it."

Subsequently the union representatives met with the employees of Standard at various times to discuss the question of organization. After some dif-

ficulty in trying to explain the advantages which would accrue to them if they joined the union, and after it had been stated that their failure to join the union would harm the employees of the company's competitors, application blanks were passed out with the request that Standard's employees sign them if they desired to join. The men were also informed that a picket line would be formed in the event they failed to join the union. At this time some of the men indicated that they had "religious objections" to joining this union and others had personal feelings against joining unions.

None of the men signed application blanks and the union representatives made no further effort to contact the officers of the company. On November 12, 1945, picketing began at the warehouse at Holland. There pickets carried signs indicating that the company was "unfair to organized labor" and to "Truck Drivers Union, Local 406." The employees of the company countered with a sign setting forth their feelings in the matter, which read "Union Unfair. We voted 100% against the AFL. Employees of the Standard Grocer Company."

As a result of this picketing two common carriers, in accordance with their union contract, refused to direct their drivers to make deliveries to Standard. Some deliveries, however, were made without regard to the picketing. After a brief period, rail deliveries were normal.

The instant case is unique in one important respect. Plaintiff company, although obviously not desirous of having its employees organized, nevertheless allowed the union to have meetings with its employees in an attempt to organize them. Standard agreed to abide by whatever decision their employees should make. The employees, after being presented with all the facts, decided unanimously that they did not want to join the union. Thus, in

actuality, it is the employees of the plaintiff company who, if any, are "unfair" to organized labor, and not the company itself.

Two major issues are thus presented. First, whether there was an existing labor dispute, and second, whether the picketing was a means to accomplish a lawful labor objective. In this respect the trial court held:

"Under the testimony it is clear that the result sought to be accomplished by picketing plaintiff's place of business was to compel plaintiff to put its employees in defendant union, regardless of whether or not such employees wished to join. Our Supreme Court has declared such objective to be unlawful. * * *

"In this case Mr. Burke offered to waive the initiation fees, but it is the unlawful 'objective' and not necessarily the means that determines whether such picketing is lawful."

The facts in the instant case closely parallel those of *Silkworth* v. *Local No. 575 of the American Federation of Labor,* 309 Mich. 746. In that case the union representatives approached the employer and made overtures concerning organizing the employees, coupled with a demand that the employer pay the initiation fees of the workers. This Court, in that case, affirmed the decision of the lower court enjoining the union from participating in picketing activities. In that case, although there are certain dissimilarities from the facts in this case, the general over-all picture is so much the same that much of what was said in the *Silkworth Case,* is applicable here. The citations and quotations covering the background material are particularly pertinent. Mr. Justice Starr, in the *Silkworth Case,* cogently pointed out some of the meat of the problem, saying:

"There was no showing that plaintiffs had interfered with defendants' efforts to unionize their driv-

ers; and no satisfactory showing that plaintiffs' drivers were willing to join the union even under a check-off system, whereby plaintiffs would pay their initiation fees and deduct the same from their wages. There was no strike and no showing of any argument or dispute between plaintiffs and their drivers over wages, hours of work, collective bargaining or terms and conditions of employment.  *  *  *

"We recognize that peaceful picketing has been upheld as an exercise of the right of free speech, and that a union may, by the process of peaceful picketing, make known the facts of a labor dispute.  *  *  *

"However, a decision of the question as to whether or not a labor dispute existed between plaintiffs and their employee drivers would not alone determine the question of defendants' right to maintain a picket line.  In recent decisions it has been held that although there was no controversy between an employer and his own employees, if the economic interests of other employees engaged in the same industry were affected, they could, through their labor union, publicize their grievance by the means of peaceful picketing."

In reaching his conclusion, Mr. Justice STARR says:

"Therefore, in the present case we must determine whether or not defendants' picketing of plaintiffs' storage plant was for the purpose of obtaining a lawful labor objective.  The motive for the picketing, that is, the result sought to be accomplished, was a question of fact.  The testimony is convincing that defendants' real objective was to compel plaintiffs to put their drivers in defendant union by paying their initiation fees, regardless of whether or not the drivers wished to join.  This was not a lawful labor objective.  Defendants could not use the lawful means of peaceful picketing to accomplish such unlawful purpose."

Apart from the effect of the Taft-Hartley law, which will be discussed later, the solution of the

problem confronting us is simplified by the guide posts set up in the *Silkworth Case.* As was recognized in the *Silkworth Case, supra,* as well as in *Bakery & Pastry Drivers & Helpers Local 802 of the International Brotherhood of Teamsters* v. *Wohl,* 315 U. S. 769 (62 Sup. Ct. 816, 86 L. Ed. 1178); *American Federation of Labor* v. *Swing,* 312 U. S. 321(61 Sup. Ct. 568, 85 L. Ed. 855); *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468 (57 Sup. Ct. 857, 81 L. Ed. 1229), and others, it is not necessary that there be a dispute between the employer and its own employees in order to give the union the right to picket the employer. In the *Silkworth Case, supra,* it was specifically decided that, "If the economic interests of other employees engaged in the same industry were affected, they could, through their labor union, publicize their grievance by the means of peaceful picketing."

But it must be remembered that this language was uttered in the light of the situation there existing, where the union and its members had a grievance with the employer of the nonunion workers. Here, we are asked to decide whether this same reasoning should apply with respect to picketing by a union and its members which actually have a grievance with the nonunion employees of their picketed employer. The language used in *American Federation of Labor* v. *Swing, supra,* is particularly applicable here. There it was said:

"That a State has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the bill of rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular State regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the

State. A State cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184, 209 (42 Sup. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360). The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in *Thornhill's Case.** 'Members of a union might, without special statutory authorization by a State, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468, 478 (57 Sup. Ct. 857, 81 L. Ed. 1229)."

Such reasoning must apply with equal force to the present controversy. There is no more reason why the constitutional freedom of speech guaranteed to workers should permit them to air to the public a dispute which they have with an employer, whose employees are nonunion, than there is why this same constitutional freedom of speech should not guarantee to them the right to air to the public those grievances which they have with workers who are nonunion. Nor would it be a proper claim for the plaintiff here to say that his business and economic interests are being adversely affected by the union's

---

* *Thornhill* v. *Alabama,* 310 U. S. 88 (60 Sup. Ct. 736, 84 L. Ed. 1093).—REPORTER.

activities in a grievance with respect to his workers. Such, if true, seems to be an injury for which the law does not compensate. For these union men may not have their right of free speech abridged, merely because plaintiff's economic interests are being damaged, without a showing of unlawful activity.

With respect to the first problem, therefore, it must be held that, although there is no labor dispute present here, the defendants' right of free speech allows them to picket, even in a case where this dispute is with the employees of the plaintiff.

A question may be raised in this respect that, conceding what has been said above, nevertheless the sign carried by the pickets said, "This company unfair to organized labor," when, in actuality, it was the employees and not the plaintiff company who were in conflict with the defendants. This argument cannot justify the issuance of an injunction in such broad language as is used in the present case, for thus far no reason is found why the defendants should not be permitted to picket the plaintiff's employees. It might, however, be said, that the sign carried in the instant case was clear enough, under the circumstances, to apprise the public of the fact that some sort of a dispute was going on, and should not, therefore, subject these defendants to an injunction merely because the word "company" was used, rather than the words "company's employees." Further, were the latter words used, the effect upon the plaintiff's business would be the same, and, therefore, this is an inconsequential argument.

We, therefore, must next proceed to the question of whether there was a lawful objective to be achieved by this picketing. In the *Silkworth Case, supra,* it was held that the forcing of an employer to pay his employees initiation fees and thus force him to put his employees in the union, was not a lawful labor objective. But it was there further said:

"We confine our holding in the present case to the point that defendants could not use the lawful means of peaceful picketing to accomplish their unlawful objective. However, our decision should not be construed as in any way limiting or restraining peaceful picketing in the accomplishment of a lawful labor objective."

We are therefore forced to determine just what the objects were which the union and its members were attempting to accomplish by this picketing.

It must be stated, at the outset, that if the object of this picketing was to coerce the plaintiff into forcing the men into joining the union, that would not be a lawful labor objective. But it fairly appears that the basic objective of the picketing in the instant case was actually to bring the working standards, so far as wages, hours, working conditions, bonuses, and vacations of the workers in the plaintiff's employ up to those of the union members. This was an essential accomplishment to the furtherance of the union's objectives as well as the objectives of their members. As long as the plaintiff's employees were receiving compensation or working conditions which were in any way inferior to those of the workers of plaintiff's competitors, the union would be greatly handicapped in any attempts to better their members' condition. This is, under the Federal authorities cited, *supra,* a clearly recognized economic fact. Therefore, in order to achieve the purposes of union organization, increasing the lot of the union members, it was necessary to increase those conditions and wages of the nonmember workers in the industry so as to satisfy the members' employers that they were not competing with companies who had a lower labor cost.

Obviously the ultimate goal sought by this picketing was the unionization of the plaintiff's employees, for if this were accomplished, it would be

easier to control the wages and working conditions of these workers. But, as pointed out above, if the objective was to coerce this employer to in turn coerce his men into becoming unionized, or to coerce the employees directly into becoming unionized, or, as later discussed herein, if otherwise declared to be unfair labor practice, it would not be a lawful objective.

It clearly appears from the record before us that, if the wages and working conditions of the plaintiff's employees were increased to those enjoyed by the union membership, these defendants would have been satisfied, for then the immediate barrier to increased benefits to the union membership would have been removed. This objective, *viz.*, the bettering of the working conditions and wages of nonunion members in the industry, so as to remove the barrier to increased benefits to union members, we must deem to be a lawful labor objective, if not otherwise prohibited by law.

That this was the objective of the instant picketing is amply supported by the record. As testified by Mackey, one of the union officers:

"There was a dispute in working conditions, trying to equalize wage conditions, and as far as Standard Grocer only giving one week's vacation when we were asking two, and in Armour and other contracts we get three weeks. How can we get grocery people three weeks if we can't get two weeks at Standard Grocer?  *  *  *

"That to get out there and organize the Standard Grocer Company, and they were hurting our conditions and therefore we couldn't go farther ahead unless there was something done about it. I knew what the conditions were at Standard Grocer Company. I knew some of the conditions."

It also appears that there was another lawful objective in connection with this picketing. In this respect Mackey testified:

"You understand, as I explained before, in our union meetings union people don't like to work with nonunion people and therefore they start to quarrel, and if the nonunion people can receive the same as the union people, why the nonunion person will say to the union person, 'You pay two bucks for nothing,' and so therefore they start to quarrel among themselves as members of our organization, and it is our duty to try to straighten out these quarrels."

In the light of this testimony, it would be a lawful objective of this picketing to attempt to induce the nonunion employees of the plaintiff to join the union so as to keep the union members satisfied, for, as stated by Mackey, one should not get the benefits of unionization without being a member. This basically is an attempt to preserve the organization and is a lawful labor objective, except as hereinafter stated.

As was said in *Harper v. Brennan,* 311 Mich. 489, 505, a case in which it was held that there was no lawful labor objective:

"No complaint is made that the employment of such employees by plaintiffs is not in full accord with union standards. As stated above the primary purpose of the picketing in this case is not to establish a closed shop or to protect or improve the interests of labor, but only to compel plaintiffs to pay monthly union dues."

This language clearly implies, although not the fact in that case, that if such an objective, *i. e.,* "that the employment of such employees by plaintiffs is not in full accord with union standards," or "to establish a closed shop," or "to protect or improve the interests of labor," is the one to be sought, then it

was at the time a lawful objective of the picketing. In the present case the two objectives of the picketing are "that the employment of such employees by plaintiff is not in full accord with union standards" and "to protect or improve the interests of labor."

Appellee, however, urges application here of the provisions of the labor management act of 1947 (Taft-Hartley law), citing *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. 184 (42 Sup. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360). That question was not presented to the trial court, nor could it have been presented as that Federal statute was not yet then enacted.

We determined that at the time the picketing was lawful. Injunctions, however, operate *in futuro*, (*Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443 [41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196]); *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. (59 U. S.) 421 (15 L. Ed. 435), and no vested right exists therein, as they may be modified or dissolved later.

The Taft-Hartley law[*] defines what shall be deemed unfair labor practice in section 8 (b) as follows:

"Sec. 8 (b). It shall be an unfair labor practice for a labor organization or its agents:

"(1) To restrain or coerce (a) employees in the exercise of rights guaranteed in section 7: Provided, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; or (b) an employer in the selection of his representatives for the purpose of collective bargaining or the adjustment of grievances;

"(2) To cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) or to discriminate against an em-

---

[*] 61 Stat. at L. 136 (29 USCA 1947 Supp. § 141 *et seq.*).—RE-PORTER.

ployee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *

"(4) To engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any service, where an object thereof is: (a) Forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; (b) forcing or requiring any other employer to recognize or bargain with a particular labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provision of section 9."

Section 7 thereof, above referred to, reads:

"Sec. 7.    Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any and all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a) (3)."

The act in question provides (section 8[c]):

"The expressing of any views, arguments or opinion, or the dissemination thereof, whether in written, printed, graphic or visual form, shall not constitute or be evidence of an unfair labor practice under any

of the provisions of this act, if such expression contains no threat of reprisal or force or promise of benefit."

This section applies both to the employer under section 8 (a) and a union under section 8 (b), and probably cuts across both the doctrine of "totality of conduct," see *Fred Wolferman, Inc.,* v. *Root,* 356 Mo. 976 (204 S. W. [2d] 733), and that of the so-called "captive audience," see New Labor Law, Labor-Management Relations Act of 1947, with explanation.  C. C. H. June, 1947, pp. 41, 42.

We are controlled by decision in *Senn* v. *Tile Layers Protective Union, supra,* and *American Federation of Labor* v. *Swing, supra.*  See, also, *Silkworth* v. *Local No. 575, of the American Federation of Labor, supra.*

The labor management act of 1947 did not and cannot abrogate the constitutional right of free speech as illustrated by the *Senn* and *Swing Cases, supra.*

The decree below is modified by deletion of that portion which abrogates defendants' right of free speech.  In other respects it is affirmed.  A modified decree may be entered here, but without costs, neither party having prevailed on appeal.

Boyles, J. *(concurring).* I concur in affirmance but do not subscribe to many of the conclusions reached by the Chief Justice.  Some additional facts should be stated in order to afford an understanding of the ground on which the injunction in this case was granted.

The events resulting in the picketing of plaintiff's places of business started when one Thomas E. Burke, an agent of the defendant teamsters union, called at the plaintiff's office in April, 1945.  Mr. Muller, the president of the plaintiff company, testified that at that time the conversation between Mr.

Burke, the manager of plaintiff's business, and himself, was to the effect that the union desired plaintiff's men to join, that they (the union) had changed their method of unionization, were working from the top down and wanted the plaintiff to see that plaintiff's men were included in the teamsters union. President Muller testified:

"*Q.* Was anything further said about how that was to be accomplished?

"*A.* Well, we were to talk to the men. We told him our men were not sympathetic, as far as we knew, and we would not force our men. Some of them were objectors and we would not force the men.

"*Q.* Objectors on what ground?

"*A.* Well, some on American principles and some on religious scruples.    *    *    *

"*Q.* What was it they wanted you to do on that behalf?

"*A.* He said they were working from the top down, rather than going to the employees they were coming to us, and wanted us to take care of that with the employees.    *    *    *

"*Q.* And then what happened, was anything said —was anything said about what the consequences might be if you didn't have your men join the union?

"*A.* Well, our response was that we refuse to coerce our men to join a union, nor had we coerced them to remain out of the union. That was their choice and we would not enter into it. He suggested that merchandise—supplies of merchandise could be cut off. And he didn't make that threat directly to us. He told us what was happening to other firms and suggested that might happen to us, that flour, sugar, shortening, had been cut off from certain other firms, and in some cases bananas, and it wasn't very long before they came to them.

"*Q.* What did you say when he suggested that?

"*A.* We said we knew they could cause much trouble, but as far as we were concerned, we would not force our men to join the union.

"*Q*. Was anything said about the—did this union representative say anything about the union contacting the men directly and talking with them?

"*A*. No. He said their method had changed, they were working from the top down."

Mr. Burke, the agent of the defendant union referred to in the above testimony, did not testify, and the above testimony stands undisputed. Subsequently the union started to picket the plaintiff's places of business. A meeting was held between organizing agents of the union and plaintiff's employees, in which plaintiff took no part. Plaintiff's employees unanimously refused to join the union. As a result of the picketing, plaintiff's wholesale grocery business was seriously curtailed, until the injunction in the present case was issued.

On this appeal, the defendant teamsters union claims that there was a lawful labor dispute between the plaintiff or its employees and the defendant union "which would authorize picketing and boycotting of plaintiff;" and that the injunction deprives the defendant union of freedom of speech, and of property without due process of law. The plaintiff-appellee claims that it was an unlawful labor objective for the defendant union to picket plaintiff's place of business "to compel the plaintiff to become the agent of the union to organize the plaintiff's employees and put them in the union in spite of the fact that the employees were all opposed to joining the union." Plaintiff also claims that the United States labor-management relations act of 1947 (the so-called "Taft-Hartley act") is now before the Court on this appeal.

The entire problem revolves around the question, "what is an unlawful labor objective, an 'unfair labor practice;' " and as to whether an unfair labor practice may be indulged in by either employer or labor organization as an exercise of the freedom of speech

guaranteed by the First Amendment to the Constitution of the United States. The defendants rely on *Senn* v. *Tile Layers Protective Union,* 301 U. S. 468 (57 Sup. Ct. 857, 81 L. Ed. 1229) ; *American Federation of Labor* v. *Swing,* 312 U. S. 321 (61 Sup. Ct. 568, 85 L. Ed. 855) ; *Bakery & Pastry Drivers & Helpers Local 802 of the International Brotherhood of Teamsters* v. *Wohl,* 315 U. S. 769 (62 Sup. Ct. 816, 86 L. Ed. 1178) ; *Cafeteria Employees Union Local 302* v. *Angelos,* 320 U. S. 293 (64 Sup. Ct. 126, 88 L. Ed. 58). The *Senn Case* was decided in 1937 and the *Swing Case* in 1941. They have since been considered and distinguished by this Court in *Silkworth* v. *Local No. 575 of the American Federation of Labor,* 309 Mich. 746 (1944), and *Harper* v. *Brennan,* 311 Mich. 489 (1945). Also directly affecting the question involved, the labor-management relations act has been enacted by Congress, effective in August, 1947.

In the *Silkworth Case, supra,* the defendant union attempted to have the Silkworths induce their employees to join the union by paying the initiation fees. The employers refused to do so, and the union by picketing plaintiffs' wholesale petroleum storage plant attempted to prevent any deliveries being made into or out of the plant. Admittedly the picketing was peaceful. There was no labor dispute between the plaintiffs and their employees, who had declined to joint the union. The Court held that it was an unlawful labor objective for the union to picket the employers in order to induce the employers to have their employees join the union by paying their initiation fees, and affirmed a decree of the circuit court enjoining a union "from picketing plaintiffs' places of business and from in any manner interfering with their business or with the delivery to them of petroleum products." The Court (syllabi) held:

"If the object sought to be obtained by a labor union through peaceful picketing is not a lawful labor objective, a court would be justified in exercising control of its acts.

"Where the real objective of defendant labor union in picketing plaintiff employers' bulk oil storage plants was to compel them to put their drivers in defendant union by paying their initiation fees regardless of whether or not the drivers wished to join, the use of the lawful means of peaceful picketing was not permissible since the labor objective was not a lawful one."

The only distinction between the *Silkworth Case* and the instant case lies in the fact that here the union is attempting to coerce the plaintiff employer to have its employees join the union by whatever means the employer may see fit to adopt, in order to save its business from harm; while in the *Silkworth Case* the specific demand was that the employers pay the fees to accomplish the same result.   Both attempts are equally unfair labor practices.   Subsequent to the decisions in the *Senn* and *Swing Cases* such attempts have been declared unfair labor practices by Congress, in the 1947 labor-management relations act.   While I believe that the decision of this Court in *Silkworth* v. *Local No. 575 of the American Federation of Labor, supra,* should be said to control decision in the instant case, I have reached the conclusion that the question of what is an unlawful labor objective, an "unfair labor practice," is now settled by the labor-management relations act of 1947[*] and that we need not resort to previous decisions of the United States supreme court, or of this Court.

Section 8 (a) of the 1947 labor-management relations act provides among other things:

---

[*] 61 Stat. at L. 136 (29 USCA 1947 Supp. § 141 *et seq.*).—RE-PORTER.

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;"

Section 7 of the act provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a) (3)."

Section 8 (a) (3), the section above referred to, has no application to the situation before us. Thus it is apparent from the record here that the defendant union, by picketing plaintiff's establishment, seeks to compel the plaintiff "to interfere with * * * or coerce (its) employees in the exercise of the rights guaranteed in section 7;" while section 7 plainly declares that employees shall have the right to refrain from joining a labor organization. Obviously the defendant union thus attempts to compel the plaintiff to do what section 8 (a) (1) of the labor-management relations act expressly declares to be an unfair labor practice.

Section 8 (c) of the labor-management relations act in substance and effect provides that the dissemination of any views, argument or opinion shall not constitute an unfair labor practice. This puts into the act the guarantee of free speech provided for in the First Amendment to the United States Constitution. However, it must be read in connection with the provisions of section 7 and section 8 (a) (1) here-

inbefore quoted. All parts of the act must be read together and if possible given reasonable effect. Section 8 (c) does not nullify the express declarations in section 7 and section 8 (a) (1).

The most recent case called to our attention is *Fred Wolferman, Inc.,* v. *Root,* 356 Mo. 976 (204 S. W. [2d] 733), decided by the supreme court of Missouri September 8, 1947. In that case, the plaintiff operated four retail grocery and meat markets in Kansas City and employed 19 butchers. The two defendants, the business agent and the president of a meat cutters and butchers union, attempted to induce plaintiff's butchers to join the union, but they voted against joining. The defendants demanded that plaintiff's executives use their influence to force the butchers to join, threatened to cut off deliveries. Plaintiff refused to sign a contract, and the union picketed plaintiff's places of business. As a result, practically all of plaintiff's supplies and deliveries were cut off. The picketing was peaceful. The plaintiff obtained an injunction restraining the picketing "on the ground it was being carried on for an unlawful purpose, namely to coerce plaintiff into signing a contract with defendants' union and to force plaintiff to coerce its butchers into joining defendants' union." The trial court enjoined the defendants from demanding that the plaintiff enter into a contract or require its employees to join the union, but refused to enjoin the peaceful picketing, and from that refusal the plaintiff appealed. The supreme court of Missouri said that the issue narrowed down to the single question whether the picketing was for an unlawful purpose and held that under the national labor relations act the picketing, being at least in part for an unlawful purpose, should be enjoined. We quote at length and with approval from the opinion. The court said:

"Under the national labor relations act some of the original purposes of the picketing were clearly unlawful because an employer subject to the act may not encourage or discourage membership in any labor organization, and may contract only with the representative of the majority. 29 USCA, §§ 158, 159. And see *National Labor Relations Board* v. *Electric Vacuum Cleaner Co., Inc.*, 315 U. S. 685 (62 Sup. Ct. 846. 86 L. Ed. 1120).

"While peaceful picketing for lawful purposes has long been upheld in this State, still the rule is well established here that where the purpose of concerted action by labor is unlawful such action may be enjoined (citing cases).    *    *    *

"However, we observe in passing that this court has also long recognized the connection between peaceful picketing and the constitutional guaranty of free speech (citing cases).

"Thus, the only question for decision is whether defendants have, in fact, renounced their unlawful purposes in picketing plaintiff's stores as the trial court found.

"The determination of the purpose or object sought to be accomplished by picketing is one of fact.

"The answer, as quoted from above, contains allegations which specifically assert a wrongful purpose under the facts of the case, namely that defendants picketed plaintiff's stores to force plaintiff to enter into a contract with the union. The answer also states the picketing is for the purpose of informing the public of plaintiff's conduct. What conduct? Clearly it must be plaintiff's refusal to bow to defendants' unlawful demands. True, the answer also states the picketing is for the additional purpose of informing the public of the refusal of plaintiff's butchers to join the union but the other allegations of the answer remain unchanged and uncontradicted and in effect admit the unlawful purpose.

"In defendants' evidence there is some testimony that defendants desired to continue picketing for the

purpose of informing the public that plaintiff's butchers are largely nonunion. However there is also testimony that deliveries to and from plaintiff's stores were stopped for the purpose of putting economic pressure upon the plaintiff so that it in turn would force its butchers to join the union. But there is no evidence of any renunciation on the part of defendants.

"Both the answer and the evidence do disclose that one of the purposes for the picketing is for giving information to the public. While we assume that purpose is lawful still when it is coupled, as it is here, with unlawful purposes, the fact one of · several purposes is lawful does not make the picketing lawful. Picketing for both lawful and unlawful purposes is unlawful. See 4 Restatement, Torts, § 796. *Cf. Baush Machine Tool Co.* v. *Hill,* 231 Mass. 30 (120 N. E. 188); *Folsom Engraving Co.* v. *McNeil,* 235 Mass. 269 (126 N. E. 479)."

The court then discussed the *Senn Case,* the *Swing Case* and others relied upon by appellants in the instant case, and concluded as follows:

"We are of opinion that none of the cases relied upon by the defendants, which we have already discussed, is authority for any principle that picketing by workmen in concert to persuade or induce an employer to do an unlawful act, one condemned by statute as an unfair labor practice and contrary to the defined public policy of the Commonwealth and of the nation, is permissible under the constitutional guaranty of freedom of speech, or otherwise."

February 16, 1948, the United States supreme court denied certiorari in the above case. 333 U. S. 837 (68 Sup. Ct. 608, 92 L. Ed. 1121).

I am in doubt as to the meaning of the decree entered herein by the lower court, as to its future effect. Nor do I understand what is meant by the Chief Justice in his opinion herein wherein he concludes with the statement that:

"The decree below is modified by deletion of that portion which abrogates defendants' right of free speech."

It is conceivable that conditions may change or circumstances arise hereafter under which picketing of the plaintiff's places of business might be considered to be for a lawful labor objective, and that a case might arise under different circumstances under which the present decree might not apply. But under the circumstances presented on the record in this case, a decree should be entered in this Court in accordance with the declarations in section 8 of the 1947 labor-management relations act, substantially as follows:

It is ordered, adjudged and decreed: That the defendants, and their officers, agents, and representatives, and each of them, do absolutely and entirely desist and refrain from:

(1) Picketing the plants and places of business of the plaintiff;

(2) Engaging in, or inducing or encouraging the employees of any employer to engage in a concerted refusal in the course of their employment to use, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services, for the purpose of preventing the delivery of such goods, articles, materials, or commodities to or from the plaintiff;

(3) Inducing or encouraging employers other than plaintiff to engage in a concerted refusal to deliver, or to cause their employees not to deliver, supplies and goods to or from the plaintiff;

(4) Threatening or ordering boycotts against persons supplying goods to plaintiff or making deliveries of goods to or from the plaintiff or purchasing goods from plaintiff or selling goods to plaintiff;

(5) The case is remanded to the circuit court for enforcement hereof, and with authority to modify

this decree as changes in conditions or circumstances may require.

Plaintiff may have costs.

Sharpe, Reid, North, Butzel, and Carr, JJ., concurred with Boyles, J.

Dethmers, J., did not sit.